786 A.2d 751

**Gary A. DEESE**

**v.**

**STATE of Maryland.**

**No. 138 Sept. Term, 1999.**

Court of Appeals of Maryland.

Dec. 17, 2001.

Sherrie B. Glasser, Asst. Public Defender, (Stephen E. Harris, Public Defender, on brief), Baltimore, for petitioner.

Diane E. Keller, Asst. Atty. Gen., (J. Joseph Curran, Jr., Atty. Gen. of Maryland, on brief), Baltimore, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, and LAWRENCE F. RODOWSKY, (retired, Specially Assigned), and THEODORE G. BLOOM, (retired, Specially Assigned), JJ.

RODOWSKY, Judge.

Gary Deese (Deese) was convicted by a jury in the Circuit Court for Baltimore County of child abuse, a felony under

Maryland Code (1957, 1996 Repl.Vol.), Article 27, § 35C. Based on the commission of a homicide in the perpetration of that felony, Deese was also convicted of second degree felony murder. The court sentenced Deese to twenty years incarceration for the felony murder, merging the sentence for child abuse. Deese appealed, and, before the Court of Special Appeals heard the case, this Court issued a writ of certiorari on its own motion. 357 Md. 481, 745 A.2d 436 (2000). Deese's primary contention is that there is no offense of second degree felony murder.

In *Fisher v. State*, 367 Md. 218, 786 A.2d 706 (2001) [ filed immediately prior hereto], this Court held that felony murder in the second degree, predicated on child abuse, or on any other inherently dangerous felony not enumerated in the first degree murder statutes, is a cognizable offense under the common law of this State. Deese's remaining contentions on appeal concern whether the court erred in accepting a witness as an expert and whether the evidence was sufficient to convict.

Beginning in August 1997, Deese lived with his girlfriend, Julie Faust (Faust), and her child, Kyle Faust (Kyle). Kyle was born on January 19, 1995, and died on February 8, 1998. The three initially lived with Deese's parents, but, at the time of the events relevant to this case, they resided in a separate apartment. While Faust was working, Kyle would go to day care; while she was not working, Faust, Deese's mother and, for short intervals, Deese himself, supervised Kyle. In January 1998, Kyle suffered a break of unknown origin in his leg. Later that month Deese's mother pointed out to Faust that Kyle had a "soft spot" in the middle of the back of his head. Faust consulted her pediatrician, Dr. John O'Donovan, who diagnosed it as a subgaleal hematoma, or blood on the outside of the skull due to an injury such as a fall. He advised Faust that such an injury is not uncommon among children of Kyle's age and that it required no special care to heal.

Approximately one week later, on February 6, Faust again brought Kyle to see Dr. O'Donovan because Kyle had a fever

of 102 degrees. Dr. O'Donovan diagnosed an ear infection, prescribed antibiotics, and noticed swelling on Kyle's left cheek which did not especially concern him. Faust testified that the next day, February 7, Kyle's fever spiked to 105 degrees and that she called Dr. O'Donovan, who advised her to wait out the fever. The fever broke that same day. Because Faust had to work that day, Deese supervised Kyle between 9:00 a.m. and 2:00 p.m.

On February 8, according to Faust, Kyle's temperature was normal and he began to feel better. Faust testified that she fed and bathed Kyle in the morning and that, while bathing him, she noticed no marks or bruises anywhere on him. Faust then put Kyle to sleep in his bedroom and closed the door. Kyle's bedroom was adjacent to the living room. Deese, who was "miserable" with a toothache, was resting in the living room. That morning Deese's mother came to the apartment to pick up some items. Around noon Faust went grocery shopping. She could not recall if Deese's mother was still in the apartment at that time. Faust returned two hours later to find Deese still resting in the living room and Kyle's bedroom door still closed. Deese told Faust that Kyle "hadn't stirred." Faust left Kyle undisturbed for a "couple hours," but then became concerned. She entered Kyle's room and found him "stiff," immobile, and with his eyes open. She "screamed" for Deese, who called emergency assistance and who relayed instructions to Faust on how to perform CPR. Faust moved Kyle's body from his bed to the floor so that she could perform CPR on him.

Samuel Snyder (Snyder), the district lieutenant for Emergency Medical Services, received a call at 4:14 p.m. on February 8 to Faust's apartment, where he and other technicians arrived within three minutes. Although Kyle already was dead by this time, Snyder and others attempted to resuscitate him. While trying to intubate Kyle, Snyder noticed that Kyle's jaw, one of the first joints to seize up in rigor mortis, was stiff, and Snyder concluded that "maybe this child had been down for quite some time." Once Kyle was transferred to the ambulance, Snyder removed Kyle's shirt and observed

"fairly extensive" bruises on his chest, on his shoulders, at the scalp line on his head, and his upper forearm. Snyder acknowledged that the bruise on the chest could have been a result of the CPR previously performed by Faust, but also stated that the other bruises were round, and possibly indicative of a thumb. These bruises were "in a place where a person would grab a child." Snyder acknowledged that, because he could not remember the color of the bruises and because the color could not be conclusively determined from post-mortem photographs, he did not know whether the bruises were "recent" or "a week old." Snyder also observed lividity, *i.e.,* pooling of blood in the body after the heart stops pumping, which indicated that Kyle "could have been dead for hours" by the time Snyder arrived.

Kyle was taken to Franklin Square Hospital's Emergency Department where Dr. Albert Romanosky, the clinical director of that department and an emergency physician, pronounced Kyle dead on arrival. Dr. Romanosky testified that he observed "multiple bruises over [Kyle's] body," including "several bruises around the head." Some bruises may have been "older bruises, five to seven, five to ten days old," while others were "more recent." Dr. Romanosky also noticed two abrasions. Using photographs at trial, he identified bruises behind the right armpit and on the buttocks area, and a "black and blue area" on the left side of Kyle's head that was consistent with a bruise and which had been soft to the touch.

On February 9, Drs. Steven Robinson and Margarita A. Korell of the Office of the Chief Medical Examiner performed an autopsy; on June 19, they reported their findings to the Baltimore County State's Attorney's Office. This report identified the cause of death as "blunt force injuries to head" and the manner of death as "undetermined," rather than as homicide. On September 9, 1998, Dr. Korell and Dr. John E. Smialek, the Chief Medical Examiner, submitted a supplemental report which identified the manner of death as homicide due to "blunt force head injuries." At trial, the State did not call any physician from the medical examiner's office, but instead entered in evidence the autopsy and supplemental

reports as a public record and pursuant to Maryland Code (1982, 1994 Repl.Vol.), § 5–311(d)(2) of the Health–General Article.[1] Deese called Dr. Korell in his case in chief, questioning her about the changed opinion as to the manner of death. Dr. Korell admitted to having met with prosecutors and police before filing the supplemental report and that new medical tests did not account for the change. On cross-examination by the State, Dr. Korell explained that she was "suspicious from day one," but was waiting to receive an "alternate explanation" as to how Kyle had been bruised; after no such explanation was forthcoming, she concluded that the manner of death was homicide.

The State entered the autopsy and supplemental reports into evidence during the direct examination of Dr. Allan R. Walker. He is an assistant professor of pediatrics and director of pediatric emergency medicine at Johns Hopkins University, as well as the director of that hospital's "child protection team." The latter is "a team which attempts to educate people around the University and the hospital about child abuse and neglect." Deese contends in this Court (see Part I, *infra*) that Dr. Walker was unqualified to opine because he was "not an expert in the field of forensic pathology."

Dr. Walker read portions of the autopsy report describing "evidence of injury" and located the injuries on photographs of Kyle's body. This evidence included the following: "bruising[ ] present over the left side of the head"; "softening and swelling present over the left parieto-occipital cavity"; "five separate contusions" identified "on the left side of the forehead"; "a one-eighth inch abrasion present on the right side of the head just above the eyebrow"; a "subdural hemorrhage" in the brain; swelling of the brain; other brain injuries, such as a contusion in the left hemisphere in the cerebellum; retinal hemorrhages, and other injuries. Dr. Walker ex-

---

1. Section 5–311(d)(2) provides that a record of the Chief Medical Examiner's Office or any deputy examiner is "competent evidence in any court in this State of the matters and facts contained in it."

plained that the soft spot on the back of Kyle's head noticed by Deese's mother and Faust before Kyle's death does not cause death and typically "resolve[s itself] without any problems." Dr. Walker concluded that "this child died of brain injury, as a result of trauma," and identified retinal hemorrhages as evidence of Kyle's having been shaken. He did not disagree with Dr. Korell's conclusion that blunt force trauma caused death, but explained on cross that "there was shaking plus impact." Describing the degree of force necessary to cause the observed injuries, Dr. Walker stated that "these . . . are the sorts of injuries that we see in children who have been accidentally injured in motor vehicle crashes or in falls from heights from more than a couple of stories[.]" The "almost immediate[ ]" effect of such injuries would be "coma, unconsciousness, or death."

On cross-examination, Dr. Walker acknowledged that the autopsy report described the brain contusions as "up to 48 hours old," but that in his opinion the actual time since the infliction of the injuries was "shorter than that" and "up to three or four hours." Dr. Walker admitted that he was unable to tell whether the abrasions that he identified were inflicted during Kyle's life or after death as part of resuscitative efforts, and that some of the bruises "appeared to be relatively fresh and some appeared to be older." He quantified these terms respectively as "one or two days" and "three to seven days." Dr. Walker also acknowledged that infection is indicated by an elevated temperature and that infection can cause swelling of the brain.

In addition, the State called Detective Jay Landsman (Landsman), who responded to Faust's apartment on the day that Kyle died. Landsman also noticed bruising on the body. He testified that the apartment was "clean," "carpeted," and contained "no items that would obviously cause injury" to a child. The only entry to Kyle's bedroom was through the living room, and there were no signs of forced entry. On cross-examination, Landsman acknowledged that Deese "[f]or the most part" cooperated with the investigation by agreeing to an interview and providing a written statement. When

questioned why Deese was not arrested during the period between the initial autopsy report and the supplemental autopsy report, Landsman explained:

"[LANDSMAN]: ... There was strong suspicion of what had occurred, that it was not an accidental death. We made every attempt to interview the, to find some other reason for this child's death. And it was obvious that the way that we placed the child in two people's custody during the time that this injury—

"[COUNSEL FOR DEESE]: Two people, you say?

"[LANDSMAN]: Two people, meaning Miss Faust and—

"[COUNSEL FOR DEESE]: Thank you.

"[LANDSMAN]: And there was, we narrowed it down to only one person [who] had an opportunity at this time where the injury occurred...."

Shortly later Landsman stated, "It was determined that this injury was caused within a 48 hour period. It's [the case that] during the 48 hour period the only person that was left alone with this child was this man here [Deese]."

The defense, in addition to calling Dr. Korell, called the defendant's mother. She testified that when she arrived at Faust's apartment on February 8 only Deese and Kyle were present. Deese, who was resting in the living room with a toothache, did not act unusual or attempt to keep her from Kyle's bedroom. She testified that she had never seen Deese hit Kyle, yell at him, or lose patience with him. Deese elected not to testify.

As noted, the jury found Deese guilty of child abuse and second degree felony murder.

I

■■ Deese argues that the court erred in qualifying Dr. Walker as an expert, because he admitted that he was not a specialist and not board certified in pathology or forensic pathology; that he belonged to no medical societies or groups having to do with that discipline; that his preparation to

testify in this case consisted of reviewing the autopsy record, photographs of the corpse, and reports of Dr. O'Donovan and of the Franklin Square emergency department; that, instead of personally examining the physical samples taken for the autopsy, he relied on Dr. Korell's reports; and that, if there were an error in Dr. Korell's autopsy report, then there "may be" an error in his own opinion as well. Deese's submission is that Dr. Walker's expertise in pediatrics and pediatric emergency medicine was not relevant to opining on the cause of Kyle's death. Because the witness "had no way of knowing whether the original [autopsy] results were accurate or reliable," Deese contends that Dr. Walker's " 'interpretation' of these findings was meaningless."

The witness has been the director of pediatric emergency medicine at Johns Hopkins for nine years. He has published in peer review journals and in textbooks on "various topics in pediatric emergency medicine." His experience as director of the child protection team has familiarized him with "head injuries and manifestation of abuse [and] shaken baby syndrome." On more than fifty occasions he has been recognized by various courts as an expert in "[p]ediatrics, child abuse, and neglect."

Maryland Rule 5–702 ("Testimony by experts") provides:

"Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony."

This Court has stated that "it is within the sound discretion of the trial court to determine the admissibility of expert testimony," and that "[a] trial court's ruling either admitting or excluding such testimony 'will seldom constitute a ground

for reversal.'" *Sippio v. State*, 350 Md. 633, 648, 714 A.2d 864, 872 (1998) (quoting *Radman v. Harold*, 279 Md. 167, 173, 367 A.2d 472, 476 (1977)). In *Sippio*, we explained that "[i]n order to determine whether a proposed witness is qualified to testify as an expert, the trial court must examine whether the witness has sufficient knowledge, skill, experience, training, or education pertinent to the subject of the testimony." *Id.* at 649, 714 A.2d at 872.

Assuming, *arguendo*, that the most relevant field of expertise was forensic pathology, as distinct from pediatrics and pediatric emergency medicine, previous decisions have affirmed a trial court's admission of expert testimony when the expert, although not a specialist in the field having the most sharply focused relevancy to the issue at hand, nevertheless could assist the jury in light of the witness's "formal education, professional training, personal observations, and actual experience." *Massie v. State*, 349 Md. 834, 851, 709 A.2d 1316, 1324 (1998). In *Massie* itself, for example, the trial court admitted expert testimony as to time of death by a "forensics employee of the investigating police department, who was not a doctor of medicine[.]" *Id.* at 835, 709 A.2d at 1316. That employee was a forensic chemist; had a Bachelor of Science degree in biology and a Master's degree in forensic science, had taken a forensic pathology course at the Armed Forces Institute of Pathology at the Walter Reed Medical Center, and had extensive experience in crime-scene investigation. He observed the victim's body on the day of the homicide, checked it for signs of post-mortem lividity, and felt its limbs for rigor mortis. He testified as to the time of death of the victim, a time earlier than that listed in the autopsy report, and a "subject which courts have long recognized as an appropriate one for expert testimony." *Id.* at 851, 709 A.2d at 1324. This Court affirmed the admission of this testimony.

*See also Oken v. State*, 327 Md. 628, 660–61, 612 A.2d 258, 273–74 (1992) (affirming admission of expert testimony by FBI special agent on a "torn edge comparison" involving rubber from shoe, despite fact that agent had made no such comparison with rubber previously, in light of his FBI training to

perform torn edge comparisons and work in twelve previous cases involving different substances), *cert. denied,* 507 U.S. 931, 113 S.Ct. 1312, 122 L.Ed.2d 700 (1993); *Tu v. State,* 97 Md.App. 486, 500–01, 631 A.2d 110, 116–17 (1993) (affirming admission of testimony by homicide detective with Master's degree in criminal justice, course work in forensic science, and extensive experience that pattern of blood splatters indicated a "blowback," whereby blood and tissue spray out of a gunshot wound due to skin's elasticity), *aff'd,* 336 Md. 406, 648 A.2d 993 (1994); *Oaks v. State,* 83 Md.App. 1, 9, 573 A.2d 392, 396 (1990) (finding that trial court did not err in admitting testimony of State Prosecutor's accountant, despite latter's lack of qualification in more specific "area of campaign financing," because his expertise in accounting sufficed to "be of assistance to the jury in tracking the 'paper trail' of campaign contributions").

In the instant case, again assuming that forensic pathology is the most relevant field of expertise, Dr. Walker's training in pediatrics and pediatric emergency medicine, combined with his experience in dealing with victims of child abuse, constituted expertise significantly more closely related to the asserted relevant field than the relationship in *Massie* between forensic chemistry/crime-scene investigation and forensic pathology. Also, Dr. Walker's training and experience in pediatric emergency medicine go significantly deeper than the forensic chemist's training in pathology in *Massie.* As the trial court in *Massie* did not abuse its discretion in qualifying the forensic chemist in that case as an expert, *a fortiori* the trial court in the instant case did not abuse its discretion.

## II

Deese argues that the evidence was insufficient to support his conviction of second degree murder because "there simply was no evidence that ... [he] was the person responsible for the death of young Kyle Faust." In particular, Deese asserts that Kyle's manner of death initially was designated as undetermined; that the change from this status to homicide was not predicated on any new medical investigation, but instead

on the absence of an alternative explanation based on Dr. Korell's "mere suspicion"; that suspicion is insufficient to support the conviction; that Dr. Korell's opinion indicated that at least some injuries had been inflicted several weeks before Kyle's death; that Kyle's fever in the days preceding his death was not entirely ruled out as a precipitating factor in his death; and finally that, because "it was never established that any event occurring that day caused [Kyle's] death," the "fact that Deese was the person last with him is without significance."

■ In reviewing a contention of insufficient evidence, the standard that we apply "is whether, after viewing the evidence in a light most favorable to the State, any rational trier of fact could have found [the] elements [of the offense] beyond a reasonable doubt." *Burch v. State,* 346 Md. 253, 272, 696 A.2d 443, 453, *cert. denied,* 522 U.S. 1001, 118 S.Ct. 571, 139 L.Ed.2d 410 (1997). This Court also has characterized sufficient evidence as "evidence that either showed directly, or circumstantially, or supported a rational inference of facts which could fairly convince a trier of fact of the defendant's guilt of the offenses charged beyond a reasonable doubt." *State v. Albrecht,* 336 Md. 475, 479, 649 A.2d 336, 337 (1994).

In the instant case Deese was convicted of felony murder in the second degree based on child abuse. In *Fisher,* 367 Md. 218, 786 A.2d 706, we held that physical child abuse is a felony that, under the particular circumstances of its commission, may be found to be dangerous to life and thus to qualify as a basis for second degree felony murder. The victim's death, of course, must be *"caused* during the commission of, or attempt to commit," the underlying felony. *Lindsay v. State,* 8 Md. App. 100, 104–05 n. 6, 258 A.2d 760, 763 n. 6 (1969) (emphasis added), *cert. denied,* 257 Md. 734 (1970). The felony of child abuse can be committed in different ways. *See Cortez v. State,* 104 Md.App. 358, 364, 656 A.2d 360, 362 (1995) (characterizing child abuse as "a multi-purpose statutory offense that can be committed in any of several different ways"). Here the relevant statutory elements include the following: (1) "abuse,"

defined as the "sustaining of physical injury by a child as a result of cruel or inhumane treatment or as a result of a malicious act"; (2) which is "cause[d]"; (3) by a "person who has . . . temporary care or custody or responsibility for supervision of a child"; and—because the felony is a predicate for second degree murder in this case—(4) the abuse must have resulted in the child's death.

Thus, the issue is whether, viewing the evidence in the light most favorable to the State, any rational jury could have found each of these four elements beyond a reasonable doubt. Deese primarily contends that the evidence is insufficient as to abuse and as to cause.

■ With respect to Kyle's fever, Dr. O'Donovan testified that he examined Kyle on February 6, two days before Kyle's death, and that he attributed the fever to an ear infection and treated it with antibiotics. Faust testified that she administered these antibiotics to Kyle; that, while his fever spiked the next day, by February 8 the fever broke; and that Kyle was eating and "fe[eling] better." The supplemental autopsy report listed the cause of death as "blunt force head injuries," and Dr. Walker, agreeing with this determination, testified that such injuries may have been caused by shaking as well as impact. A rational jury could have accepted the supplemental autopsy report's determination of the cause of death as "blunt force head injuries," and inferred that Kyle's fever did not additionally contribute to his death because Kyle's pediatrician did not find it sufficiently serious to warrant hospitalization and because the fever broke on February 7, the day before Kyle was killed. Also, there was no evidence presented that the fever did in fact contribute to Kyle's death. Thus, a rational jury could have concluded beyond a reasonable doubt that the fever was not a precipitating cause of Kyle's death.

■ Deese's contention that Dr. Korell's designation of the manner of death as homicide in the supplemental autopsy report was "based on mere suspicion" is itself unfounded. As noted above, Dr. Korell explained that she was "suspicious from day one" as to whether Kyle had been abused because of

the nature and magnitude of his injuries. She also testified that, when no alternative explanation for his injuries was forthcoming, she concluded that the manner of Kyle's death was homicide. It does not follow that this conclusion was based on "suspicion." Indeed, even if an alternative explanation is furnished, it does not result in the grant of a motion for judgment of acquittal. Even in such a case a rational jury may reject testimony regarding the alternative explanation and properly conclude, beyond a reasonable doubt, that the death was a homicide. *See Rasnick v. State,* 7 Md.App. 564, 567–68, 256 A.2d 543, 545 (1969) (holding that evidence was sufficient to sustain conviction when accused testified that victim had fallen down steps earlier in day, before accused beat victim, and when doctor testified that fatal injuries could have occurred earlier in day, because "there is no obligation on the trier of the facts to believe the testimony that there was an earlier fall"), *cert. denied,* 257 Md. 735, *cert. denied,* 400 U.S. 835, 91 S.Ct. 70, 27 L.Ed.2d 67 (1970).

In the instant case, no alternative explanation was presented to Dr. Korell (or at trial) as to the cause of Kyle's injuries. Once Dr. Korell had ruled out alternatives, her conclusion that Kyle's death was a homicide was not based on mere suspicion, but on her medical expertise as a forensic pathologist trained to recognize the cause of fatal injuries. A rational jury could have accepted this conclusion beyond a reasonable doubt. Moreover, the jury also could have believed Dr. Walker's testimony that Kyle's death was caused by "impact" or "shaking plus impact" and that the degree of force necessary to cause his injuries was equivalent to the force at work in a motor vehicle crash or a fall from a significant height. The jury could have drawn the rational inference that, absent an accident involving this degree of force, someone shook Kyle, beat him, or threw him down so as to cause his death. There was sufficient evidence to support the conclusion that a homicide was committed and that this homicide constituted child abuse within the statutory definition of that term.

 Deese's final contention as to the sufficiency of evidence concerns the element of causation. He points out that there was evidence that some of Kyle's injuries were inflicted prior to the day of his death.

 It is well settled that a conviction may be sustained on the basis of circumstantial evidence. *See Hebron v. State,* 331 Md. 219, 228, 627 A.2d 1029, 1034 (1993). As this Court stated in *Wilson v. State,* 319 Md. 530, 573 A.2d 831 (1990),

"[a] conviction may rest on circumstantial evidence alone. To ensure that the trier of fact bases a finding of guilt on the appropriate degree of certainty, we have long held that a conviction upon circumstantial evidence *alone* is not to be sustained unless the circumstances, taken together, are inconsistent with any reasonable hypothesis of innocence."

*Id.* at 536–37, 573 A.2d at 834 (citations omitted).

In the instant case, the evidence most favorable to the State is that (1) Kyle was alive on the morning of February 8, (2) Kyle was under Deese's exclusive supervision for a period of time on that day, (3) Kyle was found dead a few hours after that period, (4) death was due to blunt force injuries to the head and possibly due to shaking, and (5) no one had contact with Kyle after the period described in (2) and before the event described in (3). From these circumstances, a rational jury could have inferred, beyond a reasonable doubt, that Deese inflicted the fatal injuries.

 In previous cases challenging the sufficiency of evidence, this Court has affirmed convictions based on circumstantial evidence where a defendant, during the crime's commission, has exercised exclusive control or custody over the premises where the crime occurred or where a defendant has been the only possible agent who could have committed the crime. Exclusive control or agency can be a factor in a set of circumstances that are, in *Wilson*'s terms, "inconsistent with any reasonable hypothesis of innocence." *Id.* at 537, 573 A.2d at 834.

This Court also has overturned convictions when exclusivity was lacking. In *Tucker v. State*, 244 Md. 488, 224 A.2d 111 (1966), *cert. denied*, 386 U.S. 1024, 87 S.Ct. 1381, 18 L.Ed.2d 463 (1967), Tucker was convicted of possessing heroin. He operated a tavern, and a former employee informed the police that Tucker stashed packets of the drug in a locked, interior storeroom of the tavern. The police executed a search warrant, asking Tucker for the key to this storeroom. Tucker said that there was only one key that was kept behind the bar. When no key was found there, Tucker gave an officer his car keys and said that in his car trunk there would be a key ring containing the key to the storeroom. The officer retrieved the key ring from Tucker's car trunk, used a key on it to open the storeroom, and discovered the packets of heroin. At trial, Tucker's only witness, who claimed that she was the manager of the tavern, testified that at least seven people had access to the storeroom. This Court held that the evidence was legally sufficient in light of Tucker's admission that he had the only key to the storeroom and that "*the* key" was in his trunk. *Id.* at 501, 224 A.2d at 118–19.

In *Pressley v. State*, 295 Md. 143, 454 A.2d 347 (1983), the defendant was convicted of breaking into a basement office, from which property was taken. There were no witnesses, but the police discovered a broken window on the floor above, and on the opposite side of the building from, the basement office. The defendant's fingerprints were on broken glass from that window. On appeal the defendant challenged the trial court's instruction to the jury that it was not "required to be satisfied beyond a reasonable doubt as to each link in a chain of circumstances necessary to establish defendant's guilt." *Id.* at 146, 454 A.2d at 348. This Court determined that the instruction should not have been given, *id.* at 150, 454 A.2d at 350, but that the error was harmless in light of the instructions as a whole. While the Court's holding was couched in terms of jury instructions, *Pressley* also can stand for the proposition that the circumstantial evidence of a defendant's exclusive agency with respect to the criminal act or a

part thereof (*i.e.,* breaking the glass) can be legally sufficient to sustain a conviction (breaking into the basement office).

In *Warfield v. State,* 315 Md. 474, 554 A.2d 1238 (1989), the defendant was convicted of storehouse breaking and misdemeanor theft. Warfield had been shoveling snow for an elderly woman, Mrs. Weller, who from time to time would observe Warfield as he worked. At one point Warfield disappeared for about half an hour, which did not concern Mrs. Weller at the time. Sometime later, she saw Warfield coming out of the side entrance to her garage. She left her house and confronted Warfield, who said that he had entered the garage in order to open the front garage door, so that he could clear snow in that area. When Mrs. Weller pointed out that this was not in fact necessary, Warfield said that he had entered the garage in order to rest. When Mrs. Weller examined her garage, she noticed that a can of coins was missing. At this time Warfield was wearing no jacket, and Mrs. Weller testified that the can was too big and heavy to be carried in a pocket. Warfield denied taking the coins. At trial Mrs. Weller testified that she had seen the coins the night before, although the Court characterized the overall evidence as indicating that "[i]t was ... not certain just when Mrs. Weller had last seen the [missing] can." *Id.* at 480, 554 A.2d at 1241.

This Court overturned Warfield's theft conviction because "the evidence was not sufficient for a rational fact-finder to find beyond a reasonable doubt that Warfield stole the can of coins." *Id.* at 491, 554 A.2d at 1247. The Court noted that "presence, alone, at the place where a crime has been committed is not sufficient to establish participation in the perpetration of the crime." *Id.* (internal quotation marks omitted) (quoting *Johnson v. State,* 227 Md. 159, 175 A.2d 580 (1961)). The Court added:

> "It is also true that Warfield had the opportunity to steal the property, but others had the same opportunity between the time Mrs. Weller last saw the can and the arrival of Warfield on the scene. There was no evidence as to whether or not there were footprints in the snow leading to the side entrance to the garage before Warfield cleaned the

walks. When Mrs. Weller saw Warfield leave the garage, the can was missing, but it did not appear to be in Warfield's possession, nor is there even conjecture about how he may have disposed of it had he in fact taken it at that time. Although Mrs. Weller checked on Warfield from time to time from her window, she did not see him enter or leave the garage prior to the time which led to the confrontation, and there is no evidence that he did so. Of course, he could have been in the garage during the period Mrs. Weller did not see him working, but she did not ask him where he was during that time, and the record does not reveal his whereabouts. The mere fact that Mrs. Weller did not see him for half an hour is not enough to support a conclusion that he spent that time in the garage stealing the can of coins. A rational inference may be made from the amount of snow shoveled at the time Mrs. Weller next saw him, that he spent at least a good part of the time during his 'disappearance' shoveling snow out of the sight line of Mrs. Weller from her station at the window of her house.... The only possible support for the notion that Warfield was the thief was his presence at the scene of the crime coupled with the fact that he gave more than one reason for being there."

*Id.* at 492, 554 A.2d at 1247.

*Warfield* indicates that establishing a defendant's presence at the scene differs from establishing his exclusive custody over an item needed to commit the crime, *e.g.,* the storeroom key necessary to exercise dominion and control over the heroin possessed in *Tucker,* and differs from establishing his exclusive agency with respect to conduct that formed part of the crime's *actus reus, e.g.,* the fingerprints on the broken glass in *Pressley.*

In *Wilson,* 319 Md. 530, 573 A.2d 831, the Court considered whether there was sufficient evidence to support Wilson's conviction for theft. Wilson worked for a cleaning service, and on March 10, 1998, cleaned the residence of a woman who had recently died, and where other members of the family had been staying since her death. On that day residents of the household discovered that three rings, kept in a bag on top of

a bureau in a closet in the upstairs master bedroom, were missing. The State's only evidence consisted of the testimony of the eighty-one year old mother of the deceased. The Court summarized as follows:

"The substance of the circumstantial evidence adduced at the trial was that Wilson was present at the residence on March 10, that he cleaned upstairs on that day, and had access to the master bedroom closet where the rings were last seen. The evidence also disclosed that five other people—[namely, the mother of the deceased, the latter's two adult children, and two visitors, one of whom had gone upstairs]—were also present in the residence on March 10 and also had access to the rings in the master bedroom. Moreover, the evidence indicated that cleaning personnel, in addition to Wilson, might also have been in the residence on March 10. While a defendant's presence at the scene of a crime is 'a very important factor to be considered in determining guilt,' it is elementary that mere presence is not, *of itself,* sufficient to establish that that person was either a principal or accessory to the crime. This rule is especially applicable when, as here, the accused's presence at the crime scene was nonexclusive and was not only expected but authorized. *See Warfield v. State,* 315 Md. 474, 554 A.2d 1238 (1989) (where others also had opportunity to steal object located in garage, and defendant had reasonable explanation for presence in garage, evidence was insufficient to sustain theft conviction)."

*Id.* at 537–38, 573 A.2d at 834–35 (citations omitted) (quoting *Tasco v. State,* 223 Md. 503, 509, 165 A.2d 456, 459 (1960)). Because the State did not present any evidence to negate the "reasonable hypothesis that someone in the house on March 10 other than Wilson took the rings," the Court reversed the conviction based on insufficient evidence. *Id.* at 538, 573 A.2d at 835. Again, *Wilson* shows that mere presence, especially when nonexclusive, is by itself insufficient to establish an accused's guilt beyond a reasonable doubt.

In *Hebron v. State*, 331 Md. 219, 627 A.2d 1029, the defendant appealed his conviction for breaking and entering an unoccupied dwelling house. The evidence was presented by

" 'two individuals who resided in the victim's development.... Although neither witnessed the breaking of the victim's door frame, both identified the petitioner, in a lineup, as the driver of the car that was parked in the area just prior to the incident. One witness testified that she saw the petitioner park the car near the victim's home and, walking between two buildings, proceed in the direction of that home. She then heard a loud 'bash bang' noise. About twenty seconds later, she saw the petitioner emerge from between the two buildings, get into his car, and drive away. The second witness could only testify to seeing the driver; she did not see him approach the building.' "

*Id.* at 221–22, 627 A.2d at 1030. Splinters from the shattered door frame were found inside the house. *Id.* at 237–38, 627 A.2d at 1038.

The Court held that this evidence supported the conviction for breaking and entering. The damaged condition of the victim's door proved a breaking, and this condition

" 'coupled with the loud bang ... could lead a rational trier of fact reasonably to find that [the accused] used his body to batter the door with such force as to defeat the lock and open the door. From that, the trier of fact could further reasonably infer that, with the application of that kind of body pressure to the door, some part of [the accused's] body must necessarily have crossed the threshold when the door opened.' "

*Id.* at 238, 627 A.2d at 1039 (quoting *Hebron v. State*, 92 Md.App. 508, 511–12, 608 A.2d 1291, 1293 (1992) (alterations added)). The Court did not address explicitly the defendant's *exclusive* presence at the crime scene. Presumably, the eyewitness evidence that the defendant was near the victim's door, that twenty seconds elapsed between the defendant's proceeding toward the door and the sound of the breaking, and that no one else left the scene, sufficed to establish this

fact beyond a reasonable doubt. Most relevant to the instant case is the *Hebron* court's language that a jury could infer that "some part of [the accused's] body *must necessarily* have crossed the threshold." The emphasized portion indicates that a rational jury may draw an inference of a cause (a body part crossing the threshold of the victim's dwelling) from the effect (the condition of the door), and that this inference can suffice to establish the defendant's *agency* in committing the crime, once his exclusive presence has been established. *See also Colvin-el v. State*, 332 Md. 144, 154–55, 630 A.2d 725, 730 (1993) (evidence that defendant's fingerprints were found on pieces of glass from broken window of home and that defendant pawned jewelry stolen from home unanimously held sufficient to support conviction for felony murder of sole occupant of home), *cert. denied*, 512 U.S. 1227, 114 S.Ct. 2725, 129 L.Ed.2d 849 (1994).

In the instant case, the evidence most favorable to the State is that Kyle was fine on February 8, that Deese had exclusive custody over Kyle for several hours on this day, that Faust found her son dead later that day, and that he died due to blunt force head injuries caused by force of a magnitude at work in car crashes and falls from significant heights. There was no direct evidence of how the force was applied. Unlike *Wilson*, in which other persons were present at the scene of the crime so that the accused's presence there was not exclusive, Deese was alone with Kyle after Faust and Deese's mother left the apartment where Deese and Kyle remained. In *Hebron*, once the defendant's exclusive presence was established, the Court found that a rational jury could draw the inference of cause (defendant's unobserved breaking) from effect (the visible condition of the door). Similarly, once Deese's exclusive presence was established, and in the absence of any alternative explanation, a rational jury could infer beyond a reasonable doubt that Deese inflicted the blunt force head injuries that caused Kyle's death.

*JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED. COSTS TO BE PAID BY THE APPELLANT, GARY A. DEESE.*